THE COLLINS LAW FIRM
JOHN A. SOPUCH III    #8312
1717 Park Street, Suite 200
Naperville, IL 60563
Email: jsopuch@collinslaw.com
Telephone: (630) 527-1595
Facsimile: (630) 527-1193

CARTER SCHOLER ARNETT HAMADA
    & MOCKLER, PLLC
J. ROBERT ARNETT II #4191
8150 N. Central Expressway, 5th Floor
Dallas, TX 75206
Email: barnett@carterscholer.com
Telephone: (214) 550-8188
Facsimile: (214) 550-8185

Attorneys for Plaintiff HYE JA KIM

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| HYE JA KIM,<br><br>                    Plaintiff,<br><br>        vs.<br><br>SIDNEY K. KANAZAWA, ESQ.,  a resident of California, MCGUIREWOODS, LLP,  a Virginia limited liability partnership, and DOE DEFENDANTS 1-50,<br><br>                    Defendants. | CIVIL NO:  1:16-CV-000055<br><br>COMPLAINT; DEMAND FOR JURY TRIAL |

## COMPLAINT

Plaintiff HYE JA KIM (hereinafter "Plaintiff" or "Mrs. Kim"), alleges as follows as her Complaint against the above named Defendants.

## PRELIMINARY STATEMENT

Defendants were the lawyers for Hye Ja Kim.  While they represented her and shortly after they terminated their representation of her, Defendants obtained two releases from Mrs. Kim.  Mrs. Kim, an elderly Korean woman, does not speak English.  She cannot read anything in English.  She cannot write in English. Indeed, she is not able to even sign her name in English.  The releases that Defendants had Mrs. Kim sign concerned valuable legal claims that Ms. Kim had against Centex Homes ("Centex"), the company that had, in 2008, sold Mrs. Kim a condominium at the Beach Villas at Ko Olina ("BVKO") for $2.2 million.   The claims that Mrs. Kim had against Centex were worth substantially more than $1,000,000, and Defendants knew that. However, despite such knowledge, Defendants obtained releases from Mrs. Kim of her claims against Centex without ever communicating to her on a single occasion, and without ever meeting her.   At no time, did Defendants inform their client, Ms. Kim, what the release document was or what it did.  Indeed, at no time did Defendants even communicate in any form or fashion with Mrs. Kim.  In return for the releases Defendants obtained from Mrs. Kim, Mrs. Kim received essentially nothing. Defendants' legal

malpractice, as set forth herein, is manifest.  Ms. Kim is entitled to significant

compensation for their manifest legal malpractice.

## PARTIES

1.     Hye Ja Kim is a citizen and resident of South Korea.

2.     Mrs. Kim purchased Unit No. O-326 at BVKO from Centex in 2008.

She currently owns that unit.

3.     Mrs. Kim does not speak English.  Mrs. Kim cannot read English.

Mrs. Kim cannot write in English.  Mrs. Kim does not know how to sign her name

in English.

4.     Defendant Sidney Kanazawa ("Kanazawa") is a lawyer who is, and

was at the time of the allegations set forth herein, licensed to practice law in the

State of Hawai'i.  Mr. Kanazawa is a resident of the State of California.

5.     Defendant McGuireWoods, LLP ("McGuireWoods") is a law firm

with offices in Atlanta, Austin, Baltimore, Brussels, Charlotte, Charlottesville,

Chicago, Dallas, Houston, Jacksonville, London, Los Angeles, New York,

Norfolk, Pittsburgh, Raleigh, Richmond, Tysons Corner, Washington, D.C. and

Wilmington.  At the time of the allegations set forth herein, Kanazawa was a

partner at McGuireWoods.  Because it is a partnership, McGuireWoods is a

resident of every State in which its partners are residents.

6.     Doe Defendants 1-50 are persons, partnerships, associations, companies, corporations or entities whose names, identities, capacities, activities and/or responsibilities are currently unknown to Mrs. Kim or her attorneys except that Doe Defendants 1-50 were and/or are subsidiaries, servants and/or employees, representatives, co-venturers, associates, consultants, owners, lessees, lessors, guarantors, assignees, assignors, licensees, and/or licensors of Defendants and were or are in some manner presently unknown to Mrs. Kim or her attorneys engaged or involved in the activities alleged herein or responsible for the activities of which Mrs. Kim complains, or should be subject to the relief that Mrs. Kim seeks.  Mrs. Kim prays for leave to certify the true names, identities, capacities, activities and/or responsibilities of Doe Defendants 1-50 when, through discovery in this case, the same are ascertained.

## JURISDICTION AND VENUE

7.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between Mrs. Kim and Defendants and the amount in controversy exceeds $75,000, exclusive of interest and costs.

8.     This Court has personal jurisdiction over Defendants because, at the pertinent time of the allegations set forth herein, they were conducting business in

the State of Hawai`i and committed acts in the State of Hawai`i giving rise to Mrs.

Kim's causes of action.

9.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a

substantial part of the events or omissions giving rise to Mrs. Kim's causes of action

occurred in the City and County of Honolulu.

## STATEMENT OF FACTS

**A.     Defendants Represented Mrs. Kim**.

10.     Before February 9, 2010, Defendants began to represent Mrs. Kim as

her lawyers.  Defendants' representation of Mrs. Kim continued until at least

December 6, 2012 when Defendants notified Mrs. Kim in a letter that Defendants

were "clos[ing]" their representation of Mrs. Kim.

11.     During the time that Defendants represented Mrs. Kim, an attorney-

client relationship existed between Defendants, on the one hand, and Mrs. Kim, on

the other hand.

12.     During the time that Defendants represented Mrs. Kim, Defendants

owed Mrs. Kim a fiduciary duty.  Thereafter, Defendants owed Mrs. Kim fiduciary

and ethical duties by virtue of, inter alia, The Rules of Professional Conduct.

13.    The internal client matter number that Defendants assigned to their representation of Mrs. Kim was 2056745-0001.[1]  The purpose of the internal client matter number was, among other things, so that Defendants could keep track of the amount of time that was billed to a particular client representation and so that there would be a record generally describing the services performed by Defendants and on what day those services were performed.

**B.    The Scope Of Defendants' Representation Of Mrs. Kim Included An Analysis And Determination Of Claims Against Centex.  That Analysis And Determination Was Never Shared With Mrs. Kim.**

14.    The subject and scope of Defendants' representation of Mrs. Kim (i.e., client matter number 2056745-0001) included, inter alia, Mrs. Kim's purchase from Centex of her condominium unit at the BVKO.

15.    Defendants' representation of Mrs. Kim related to the use of, and control over, amenities located at BVKO.  At the time that Mrs. Kim purchased her BKVO unit, Centex, the developer of BVKO, had misrepresented to Mrs. Kim (and many other BVKO purchasers) that she would always be able to use the amenities.

16.    Unbeknownst to Mrs. Kim at the time she purchased her unit, Centex had agreed to sell the amenities to a third-party located in Honolulu, i.e., Ko Olina

---

[1] Mrs. Kim was not the only client that Defendants represented in client matter number 2056745-0001.  Along with Mrs. Kim, there were the owners of 87 other BVKO units who were jointly-represented by Defendants in client matter number 2056745-0001.

Development LLC ("KOD"), but had failed to put any protections in place which would have made sure that, if and when KOD bought the amenities from Centex, Mrs. Kim would always be able to use the amenities just as she had when Centex owned the amenities.

17.     Defendants' engagement or retainer letter for client matter number 2056745-0001 describes what their representation would entail.  That letter states that Defendants' representation (i.e., client matter number 2056745-0001) would initially cost approximately $60,000 and involve, among other things: (1) a "review" of the Sale Contracts which were pertinent to Mrs. Kim's ownership of her BVKO unit and the amenities at BVKO—these Sales Contracts stated that only Hawai'i law was to apply and govern in any and all disputes between Mrs. Kim and Centex; (2) "interviews with clients regarding the current status of" the matter "and the current status of the documents"; (3) determining "the limits, if any, on [Mrs. Kim's] ability to have [her] dispute [with Centex] resolved by a court or a jury rather than in arbitration"; (4) "research…focused on developing either grounds for fraud [by Centex] in the original sale of the residential units and/or developing conceptual fair dealing duties of [Centex] to" Mrs. Kim; (5) the preparation of "position papers and meetings to persuade the developer [Centex] and others to provide protections for" Mrs. Kim.

18.     Defendants' engagement or retainer letter also stated that, "In the event that this matter cannot be settled" and "proceed[s] to litigation in the courts or in arbitration", Defendants anticipated that they would need to do the following, among other things:  (1) "Prepar[ing]…a complaint against [Centex]"; (2) "Respon[ding] to initial motions; and (3) "extensive discovery."  To handle that extensive discovery, Defendants' engagement or retainer letter represented that they (Defendants) "will be retaining local [Hawaii] counsel to conduct most of this discovery."  Defendants' engagement or retainer letter also explained that, should a trial or arbitration against Centex be required, Defendants expected such a proceeding to last "20" days.

19.     Defendants' billing records in client matter number 2056745-0001 also provide a description of what they were doing as part of their representation of Mrs. Kim. Those records show that, as part of their representation of Mrs. Kim, Defendants, among many other things: (1) conducted legal research regarding Hawaii's consumer protection statutes to determine if Centex had violated such statutes; (2) reviewed and analyzed case law related to those Hawaii statutes; (3) conducted legal research regarding Hawaii's unfair practices statute to determine whether Centex had violated that statute; (4) drafted memoranda regarding the rights that Mrs. Kim had against Centex; (5) prepared an analysis regarding the rescission rights that Mrs. Kim had against Centex; and (6) "review[ed] law

regarding causes of action [against Centex] and [the Hawaii] statutes of limitations' for those causes of action."

20.    Other documents prepared by Defendants while they were representing Mrs. Kim in client matter number 2056745-0001 also show that the scope of Defendants' representation specifically included determining whether Mrs. Kim had viable claims against Centex for making "false and misleading" statements at the time Mrs. Kim bought her unit in 2008 about the BVKO owners' use and control of the BVKO amenities.

21.    These other documents prepared by Defendants show that the scope of Defendants' representation of Mrs. Kim in client matter number 2056745-0001 also involved an analysis regarding whether she had claims against Centex based on various Hawaii statutes, including Hawaii Revised Statutes §§ 514B-67, 514B-94, 480-2 and 480-13.  These documents prepared by Defendants also show that Defendants concluded that the remedies available to Mrs. Kim may include "Rescission", "Damages", "Treble Damages" and "Attorneys Fees."

22.    As part of their representation of Mrs. Kim and in order to preserve and safeguard all of legal claims that she had against Centex, in August 2009, Defendants drafted a Standstill and Tolling Agreement ("STA") and were able to convince Centex to sign it.  The STA made sure that the statute of limitations on "any and all claims or causes of action for damages of any scope and description

inclusive of but not limited to resultant damages and/or punitive damages, whether at law or in equity, known or unknown, past, present or future, contingent or uncertain, of whatsoever nature, arising, arisen, growing out of, connected with or in any manner involving, concerning or relating to or arising out of the purchase by a Homeowner of any unit in the Project or related or arising out of Centex's creation, management and/or administration of the Project, inclusive of any act, omission, duty, obligation, agreement, representation of Centex or anything whatsoever with regard to any allegations of mischaracterization, misrepresentation, nondisclosure or rescission of the Homeowners' purchase contracts with Centex for residential apartments in the Project; or arising out of any obligation of good faith and fair dealing in favor of the other" were tolled while Defendants and Centex tried to work out a settlement.

23.     Defendants never explained to Mrs. Kim what the STA was.

24.     Defendants never had the STA translated into Korean for Mrs. Kim.

25.     Defendants never communicated with Mrs. Kim about the STA.

26.     Defendants never had any communication directly with Mrs. Kim.

27.     Defendants never asked Mrs. Kim whether she understood what the STA was, and never asked her if she had any questions about it.

28.     Defendants never explained to Mrs. Kim the claims or causes of action that were the subject of the STA.

29.    Defendants obtained Mrs. Kim's name on the STA.

30.    Mrs. Kim had no idea what the STA was.

**C.    Defendants Obtain First Release From Mrs. Kim.**

31.    In early 2010, Defendants recommended that their clients in matter

number 2056745-0001 agree to allow Defendant Kanazawa to enter into a

settlement on their behalf with Centex. The settlement contained a release of all

claims in favor of Centex.

32.    Defendants never explained their recommendation to Mrs. Kim.

33.    Defendants never explained to Mrs. Kim what the claims were against

Centex that she would be releasing.

34.    Defendants never explained to Mrs. Kim the effect of the settlement.

35.    Defendants never communicated with Mrs. Kim in any form or

fashion.

36.    Defendants never had any of their e-mails where their

recommendations were contained translated into Korean for Mrs. Kim.

37.    Kanazawa never spoke to Mrs. Kim.

38.    In a January 30, 2010 e-mail, Defendant Kanazawa wrote "Dear

Clients, Attached is a power of attorney for your signature. By signing this

document you are giving me the authority to sign a settlement agreement on your

behalf with the provisions indicated and you will be bound to the terms of that agreement….I recommend settlement under these terms."

39.    Kanazawa's January 30, 2010 e-mail was never translated into Korean for Mrs. Kim.

40.    Kanazawa never spoke to Mrs. Kim about his January 30, 2010 e-mail or what it meant.

41.    Defendant Kanazawa's January 30, 2010 e-mail then went on to explain to Defendants' "Clients", including Mrs. Kim, that "**The most critical feature of the [settlement] agreement** [that he was recommending they give him authority to enter into] **is that you are agreeing to not sue and agreeing to waive your rights against Centex…."**

42.    Kanazawa never explained to Mrs. Kim what "**the most critical feature"** of the settlement agreement was.

43.    Kanazawa never explained to Mrs. Kim what her rights were that she was waiving.

44.    Defendants were able to obtain Mrs. Kim's name on the settlement agreement, even though they had never communicated with her.

45.    The Settlement and Release Agreement was dated and effective on February 9, 2010 (the "February 2010 Settlement").  Defendants, however, never provided Mrs. Kim or any of their other jointly represented clients a copy of the

February 2010 Settlement before it became effective. Not that it would have mattered in Mrs. Kim's case as she could not have read it anyway.

46.     Kanazawa never had the February 2010 Settlement translated into Korean for Mrs. Kim.

47.     Kanazawa never had any conversation ever with Mrs. Kim about February 2010 Settlement.

48.     Kanazawa never had any direct communications or conversations with Mrs. Kim.

49.     In a February 9, 2010 e-mail (i.e., the effective date of the February 2010 Settlement) clients, Defendant Kanazawa explained why none of his clients would be allowed to see the February 2010 Settlement that he was entering into on their behalf with Centex.  Specifically, Kanazawa explained: "Dear Clients…I have not been able to provide you with a copy of the [February 2010 Settlement] b/c Centex wants to preserve its attorney work product and attorney client privileges with respect to any drafts of the settlement agreement…." Defendant Kanazawa never explained how Centex could maintain such claimed "privileges" over the draft settlement even though Centex, his clients' opponent, had the draft settlement.

50.     Kanazawa never had his February 9, 2010 e-mail translated into Korean for Mrs. Kim.

51.    Kanazawa never communicated with Mrs. Kim about the substance of his February 9, 2010 e-mail.

52.    For its part of the February 2010 Settlement, Centex agreed to take certain steps, including continuing its ongoing efforts in a Hawai'i federal lawsuit in which it was involved, to try and retain control and use of the amenities that it had promised to Mrs. Kim and Defendants' other jointly-represented clients when they bought their BVKO units.

53.    For the next two years, Defendants continued their representation of Mrs. Kim and of their other jointly-represented clients in client matter number 2056745-0001 to ensure that Centex complied with the terms of the February 2010 Settlement and followed through with the Hawai'i federal litigation.

**D.    Defendants Terminate Their Representation Of Mrs. Kim And Go To Work On Behalf of Centex.**

54.    On December 6, 2012, Defendants informed Mrs. Kim by letter that they (Defendants) were terminating their representation of her.  The letter was in English, and was never translated into Korean.  In the letter, Kanazawa wrote: "Dear Clients…. Because the settlement with Centex has concluded and the recent decision of the Ninth Circuit has affirmed the recharacterization, it is time for me to formally conclude my representation of you and thank you for allowing me to represent you in this matter."

14

55.     In December 2010, nearly 2 years before Defendants terminated their representation of Mrs. Kim in client matter number 2056745-0001, Centex sold -- for one dollar ($1) -- the BVKO amenities to KOD.  Upon purchasing the amenities from Centex for $1, KOD, as was its absolute legal right, in February 2011, padlocked the BVKO amenities, excluding Mrs. Kim from being able to use the amenities.

56.     At the time that KOD locked Mrs. Kim out of the amenities, Defendants owed Mrs. Kim a fiduciary duty and an attorney-client relationship existed between Defendants, on the one hand, and Mrs. Kim, on the other hand.

57.     After KOD locked out Mrs. Kim from the amenities in February 2011 and before December 6, 2012 when they terminated their representation of Mrs. Kim, Defendants concluded that Mrs. Kim had a breach of contract claim against Centex based on KOD's actions in locking up the amenities.

58.     While they represented Mrs. Kim, Defendants knew that Mrs. Kim's breach of contract claim against Centex based on KOD's actions in locking Mrs. Kim out of the amenities was worth substantially more than $1 million.

59.     Defendant Kanazawa himself has stated under oath that the breach of contract claim that Mrs. Kim had against Centex based on the lockout by KOD had **not** been released by The February 2010 settlement.  Specifically, Defendant Kanazawa stated under oath "The Covered Claims [against Centex, as that term is

defined in the February 2010 Settlement] are limited to the claims that existed up until February 9 of 2010…. **[T]his [February 2010 Settlement] Agreement has nothing to do with the claims regarding the lockout.**"

60.     Despite representing Mrs. Kim at the time of the KOD lockout and for 22 months thereafter, at no time did Defendants ever advise Mrs. Kim that she had a breach of contract against Centex based on the KOD lockout.

61.     At no time did Defendants ever speak to Mrs. Kim.

62.     At no time did Defendants ever communicate with Mrs. Kim.

63.     At no time did Defendants ever advise Mrs. Kim that she could indeed sue Centex because the KOD lockout gave rise to a breach of contract claim that had not been released by way of the February 2010 Settlement.

64.     At no time did Defendants ever advise Mrs. Kim that the release in the February 2010 Settlement Agreement did not cover claims against Centex based on the KOD lockout.

65.     Had Defendants informed Mrs. Kim that she had a breach of contract against Centex based on the KOD lockout, Mrs. Kim would have pursued that claim.

66.     Had Mrs. Kim pursued that claim, Mrs. Kim would have prevailed against Centex on that claim just as more than twenty (25) other BVKO owners had done.

**E.    Defendants Secretly Work With Centex To Extinguish Mrs. Kim's Claims.**

67.    No later than October of 2012 **and while Defendants were still representing Mrs. Kim in client matter number 2056745-0001**, Defendant Kanazawa contacted Centex.  At that time, Defendant Kanazawa explained to Centex what he never explained to Mrs. Kim, i.e., that all of his clients, which specifically included Mrs. Kim, had new (and unreleased) claims against Centex based on the KOD lockout.

68.    Kanazawa told Centex that its exposure from his clients' claims based on the KOD lock-out well exceeded $100 million.  Kanazawa, however, never told Mrs. Kim what her breach of contract claim against Centex was worth, and never told her that her breach of contract claim entitled her to, among other things, force Centex to buy back her unit for significantly more than the $2.2 million that she paid for it in 2008.

69.    In a July 5, 2013 e-mail to Centex's General Counsel, Kanazawa explained to Centex that he had developed a plan, the "essence" of which was to eliminate, in Centex's favor and for pennies on the dollar, all of his clients' breach of contract claims against Centex based on the KOD lockout.  The "goals of [Kanazawa's] proposal", Kanazawa wrote to Centex's General Counsel, was: "Number 1, to curtail Centex's litigation exposure – both in terms of individual

unit liability [i.e., to Defendants' clients] and long-term continuing defense of arbitrations…."

70.     Kanazawa never informed Mrs. Kim about his July 5, 2013 e-mail.

71.     Kanazawa never provided Mrs. Kim with a copy of his July 5, 2013 e-mail.

72.     At no time did Defendants seek permission from Mrs. Kim, or even inform Mrs. Kim, that Kanazawa was advising Centex on how to "curtail Centex's litigation exposure" based on the KOD lockout. Mrs. Kim was not aware that Defendants had contacted or were assisting Centex in curtailing its litigation exposure against her.

73.     Defendants' work in assisting Centex to curtail its litigation exposure to Defendants' clients was substantially related, if not identical, to Defendants' representation of Mrs. Kim in client matter number 2056745-0001.  Indeed the goal of Defendants was identical in both their representation of Mrs. Kim and the other owners and their work assisting Centex.  That goal was to obtain from Mrs. Kim releases of her claims against Centex.

74.     Defendants worked with Centex to prepare a Settlement and Release Agreement; Joinder by the AOAO document ("the July 2013 Settlement"), pursuant to which "Homeowners" who signed the document released all "Covered Claims" against Centex.  The release that Defendants and Centex drafted

18

eliminated every claim that Mrs. Kim had against Centex based on the KOD

lockout, i.e., claims that Mrs. Kim and Defendants' other jointly represented

clients never knew that they had.  For its part, Centex agreed to pay up to $15

million for the benefit of the Homeowners.

75.    Mrs. Kim did not know that Defendants were involved in the July

2013 Settlement.

76.    At the direction of Defendants, the AOAO aggressively campaigned

to obtain as many signatures of as many Homeowners as possible to the July 2013

Settlement.  Mrs. Kim's name appears on the Settlement in July of 2013.

Defendants did not explain to Mrs. Kim that **"The most critical feature of the**

**[previous settlement] agreement**", i.e., that Mrs. Kim had **"agree[d]to not sue**

**and agree[d] to waive [her] rights against Centex…."** was no longer applicable,

and that Mrs. Kim could indeed sue Centex based on the KOD lock-out and indeed

had new right which had not been waived by the previous settlement.

77.    With the assistance and guidance of Defendants, Centex successfully

eliminated well over $100 million in liability to Defendants' clients in client matter

number 2056745-0001 for just $15 million.

## <u>CAUSES OF ACTION</u>

**Count One:  Legal Malpractice**

78.   Mrs. Kim repeats and incorporates by reference her allegations in paragraphs 1 through 77 of the Complaint.

79.   Mrs. Kim, on the one hand, and Defendants Kanazawa and McGuireWoods, on the other hand, had an attorney-client relationship.

80.   Defendants Kanazawa and McGuireWoods owed Mrs. Kim a duty to use such skill, prudence, and diligence as lawyers in the State of Hawai'i of ordinary skill and capacity commonly possess and exercise in the performance of the tasks which they undertake.

81.    As set forth herein, Defendants Kanazawa and McGuireWoods breached their duty to Mrs. Kim by, among other things, failing to advise Mrs. Kim that she had valuable claims against Centex and by, unbeknownst to Mrs. Kim, advising and assisting Centex in eliminating Mrs. Kim's valuable claims for much less than Defendants knew Mrs. Kim's claims were worth.

82.    There is a causal connection between the breaches of duty by Defendants Kanazawa and McGuireWoods and Mrs. Kim's injuries.

83.   Mrs. Kim suffered actual loss or damages as a result.

**Count Two:  Breach of Fiduciary Duty**

84.     Mrs. Kim repeats and incorporates by reference her allegations in paragraphs 1 through 83 of the Complaint.

85.     As Mrs. Kim's attorneys, Defendants Kanazawa and McGuireWoods, owed Mrs. Kim fiduciary duties.

86.     Defendants Kanazawa and McGuireWoods breached their fiduciary duties to Mrs. Kim by, among other things, failing to advise Mrs. Kim that she had valuable claims against Centex and by instead, unbeknownst to Mrs. Kim, advising and assisting Centex in eliminating Mrs. Kim's valuable claims for much less than Defendants knew Mrs. Kim's claims were worth.

87.     Defendants Kanazawa's and McGuireWoods' breaches of fiduciary duties proximately caused injury to Mrs. Kim.

88.     Mrs. Kim suffered actual loss or damages as a result.

WHEREFORE, Mrs. Kim prays for relief as follows:

A.     For damages against the Defendants in an amount to be determined at trial;

B.     For punitive damages in an amount to be determined at trial;

C.     For reimbursement of costs and expenses, including its reasonable attorneys' fees;

D.     For prejudgment and post-judgment interest at the highest rates

permitted by law; and

E.     For such further and additional relief as the Court finds just and

equitable.

DATED:  Honolulu, Hawai'i, February 8, 2016

                              */s/ J. Robert Arnett II*
                              JOHN A. SOPUCH III
                              J. ROBERT ARNETT II
                              Attorneys for Plaintiff HYE JA KIM